## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VIRGINIA J. STRAIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNIVERSITY OF PITTSBURGH | ) |
| MEDICAL CENTER, | ) |
| | ) |
| Defendant. | ) |

No. 2:04-cv-1660
Judge Thomas M. Hardiman

## OPINION

### I.    Introduction

On October 29, 2004, Plaintiff Virginia J. Strain (Strain) brought this action against her

employer, Defendant University of Pittsburgh Medical Center (UPMC), alleging that UPMC

demoted her because of her age and gender and replaced her with a younger male in violation of

the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000(e), and the Pennsylvania Human Relations Act, 43 Pa. C.S.A.

§ 955(a). Strain also alleges that UPMC retaliated against her by issuing an unsatisfactory

performance evaluation and by stripping her of all meaningful duties after she filed a charge with

the Equal Opportunity Employment Commission (EEOC).

After UPMC's motion for summary judgment was denied, on December 18, 2006 the

Court conducted a bench trial pursuant to Rule 52 of the Federal Rules of Civil Procedure. The

parties filed Proposed Findings of Fact and Conclusions of Law (Strain Findings and UPMC

Findings, respectively) on February 22, 2007. After having reviewed and considered the parties'

post-trial submissions, the Court concludes that UPMC is entitled to judgment on all of Strain's

claims.

## II.    Findings Of Fact

Plaintiff Virginia Strain is 63 year-old woman with a bachelor's degree in medical technology and a master's certification in project management. Beginning in the late 1980s, various companies employed Strain in their information technology departments until 1999, when South Side Hospital — her employer at that time — was purchased by Defendant UPMC. In her first year at UPMC, Strain helped coordinate the information systems in the newly-purchased hospital facilities with the system already in place at UPMC and helped ensure that the resulting network was Y2K compliant, during which time she received three promotions and a favorable employment review.[1] Strain's last promotion was to the position of Project Lead within UPMC's Information Services Division (ISD) in late 1999, a position she continues to hold at UPMC to this day.

In the early 2000's, Dr. Robert Schwartz, M.D., UPMC's Medical Director, conceived of the Physician Portal Project (Physician Portal), which was designed to facilitate the computerized sharing of medical records between doctors inside and outside UPMC, thereby improving patient care, eliminating unnecessary paperwork, and building relationships with referring physicians. The ISD decided to fund the Physician Portal in 2000, and asked Schwartz to implement it. Because Schwartz was not trained in information technology, and because software for implementation of the Physician Portal was not available off-the-shelf, the project required a team with the skills to develop most of the necessary computer software. To that end,

---

[1]     UPMC assesses its employees on a three-point scale and then derives an average, which represents the employee's overall score. A score of "3" is reserved for employees who "consistently exceed[] expectations." A score of "2" is assigned to employees who "consistently meet[] expectations." Employees who "do[] not consistently meet expectations and [for whom] improvement is needed" are rated a "1." In July 2000, the average of Strain's scores was 2.5.

and because Dr. Schwartz had many other administrative responsibilities, he asked ISD for additional staffing for the Physician Portal.

In response to Dr. Schwartz's request, ISD referred Strain as a potential addition to the Physician Portal team. Schwartz interviewed Strain for the position and explained the objectives of the Physician Portal and the demands that the Project Lead would face.[2] Schwartz specifically told Strain that it was important for the Project Lead on the Physician Portal to be comfortable working independently in an environment where there could be abrupt changes in direction of the project. Based on Strain's representations at the interview that she was comfortable with the role she would serve on the Physician Portal, and because she seemed eager and excited about the project, Schwartz added her to the team.[3]

Strain began reporting to Dr. Schwartz and working on the Physician Portal in March 2001, during which time the team — which consisted of Schwartz, Strain, and three developers — assessed the scope of the project, considered which software suite to use for the pilot programs, and prepared grant applications to secure long-term funding for the project. Late in

---

[2]   Although Strain testified that she was never told that this initial meeting was an interview, the Court finds credible Dr. Schwartz's testimony that this was, in fact, an actual interview prior to Strain being named the Project Lead on the Physician Portal.

[3]   The parties disagree whether Strain was to continue as a Project Lead or be promoted to Project Manager while working on the Physician Portal. Strain insists that Schwartz enticed her to work on the Physician Portal by promising her a formal promotion to Project Manager. Although Schwartz testified that Strain's job title was Project Lead and denied ever promising her a promotion to Project Manager, he conceded that he felt that Project Lead and Project Manager were synonymous titles because both positions require management of lower-level employees. Although the testimony offered by both parties on this point was credible, the Court concludes that if Schwartz did use the term "project manager" in relation to Strain's role, he did so loosely — to connote one who *manages* a project — rather than with the concrete promotion and pay grade implications that Strain evidently had in mind when she used the term. Schwartz's loose usage of these terms is consistent with the testimony of William Freker, who testified that Strain was called a "project manager lead" on one of his projects.

3

2001, Schwartz gave Strain an overall score of 2.16, with some of the component scores either barely above or somewhat below expectations.[4]

In 2002, the team began to bring some of the Physician Portal's pilot projects on-line; meanwhile, Strain and the rest of the team began testing to ascertain the need for additional applications and to work out the bugs in the existing system. That year, Strain began supervising the three analysts on the Physician Portal team. At the end of 2002, Schwartz again evaluated Strain on the three-point scale; although her overall score had improved to 2.27, several of her component scores remained on the low end of "meeting expectations."[5] Strain did not complain about either of these evaluations, which — when compared to the performance evaluation ratings for employees within the organizational units for which Schwartz was responsible — placed her at the bottom of Schwartz's group. Before and after her review, Strain asked Schwartz to promote her to Project Manager. Although it is unclear whether Schwartz considered the idea seriously, Strain was not promoted.

Under the day-to-day supervision of Dr. Schwartz, the team developed seventy-seven operational pilot software products for the Physician Portal by 2003. Eventually, however, the software needed to move past the pilot stage and into the final product stage. In April 2003,

———— ——— —— ———

[4]     Schwartz rated Strain's "resourcefulness" — which is defined in UPMC's evaluation form as "requires minimal supervision" — as 2.1. He rated Strain's "initiative" — defined as "takes independent actions and calculated risks" — as 2.2; under the category of "leading change," defined as "initiates the change process" and "leads initiatives to change the structure, system or talent mix of the organization to more effectively support the business strategy," Schwartz gave Strain a rating of 1.8.

[5]     Strain's performance rating in the category of "resourcefulness" declined from a rating of 2.1 for the previous year to a rating of 2.0, and the rating in the category of "initiative" declined from the rating for the previous year from 2.2 to 2.0, while the rating in the category of "leading change" increased from 1.8 to 2.0.

4

Schwartz determined that the Physician Portal needed to move in a more technical direction to ensure that the final product was capable of supporting the entire UPMC health system. Based on Schwartz's experience in working with Strain during the two previous years, he concluded that she was not the right person to lead the transition of the Physician Portal pilot software into its final product stage because — although she was attentive and followed directions well — he was required to "micro-manage" her activities. Because Schwartz did not believe that any member of the current team was capable of leading the move of the Physician Portal software from its pilot stage to the final product stage, and because the demands of his other duties as Medical Director required him to extract himself from his day-to-day work involvement with the project, he realized he needed help.

To that end, Dr. Schwartz contacted Sue Paone, an ISD director, and asked whether ISD could assume control of the Physician Portal. In response to this request, Paone instructed one of her subordinates, Mary Jo Jefferson, to assume Schwartz's duties on the Physician Portal. Jefferson, who was 54 years-old at the time, recently had been hired into ISD as UPMC's Manager of Client Services in March 2003. Thereafter, Jefferson became responsible for development on the Physician Portal, in addition to her duties on financial systems and web services hosting. Under this new arrangement, neither Schwartz nor Jefferson supervised one another.

In April 2003, approximately one month after Jefferson was hired at UPMC, Dr. Schwartz briefed her about the Physician Portal. He told her that he wanted to relinquish his role as day-to-day supervisor of the Physician Portal to an ISD employee. Schwartz explained that he wanted certain of the Physician Portal software applications to be operational — that is, to be

5

"rolled out" in final product stage for access by the intended users — by September 30, 2003. Schwartz also told Jefferson that although Strain took direction well, she was not the person to actually *lead* the project. Schwartz did not, however, tell Jefferson that he wanted Strain to be replaced as the Project Lead. Instead, he merely told Jefferson to deliver the software products and left it up to her how best to accomplish this mandate.

In May 2003, Jefferson met with employees who already were working on the Physician Portal, including Strain. Under the new hierarchy, Strain was no longer under Dr. Schwartz's supervision and began reporting directly to Jefferson. In light of those meetings, her discussions with Schwartz and ISD management, her assessment of status of the project, the September 30, 2003 roll-out date, as well as her own business workload, Jefferson knew that she needed help quickly on the Physician Portal from someone who understood the technical aspects of web hosting and who could collaborate on the project to meet the impending September 30, 2003 deadline.

Within two weeks after she had been assigned to the project, Jefferson decided to add Mark McDade — whom she knew had been performing project lead work in the area of web hosting — to the Physician Portal team.[6]  McDade, who was 35 years-old at the time, had been hired by UPMC in October 2001 to work in the web services group of ISD, leading projects involving the development of applications on UPMC's website for access by clinicians using UPMC services. Before his employment with UPMC, McDade worked for nearly ten years with

---

[6]    Although Strain expressed skepticism that it was Jefferson — and not Dr. Schwartz — who made the decision to bring McDade onto the Physician Portal team, she offered no evidence (besides her own disbelief) to contradict Jefferson's testimony that she alone selected McDade for the project.

6

the Procter & Gamble Company (P&G) in the area of information technology; the final year of his tenure at P&G was spent in project management.

When Jefferson brought McDade onto the Physician Portal, she knew he would be taking a leading role on the project, but she had not yet decided whether to shift any of Strain's duties to him — particularly in light of Strain's history with the project — or whether McDade was to replace her as the Project Lead in developing the pilot software to its final product stage by the September 30, 2003 roll-out deadline. Thus, when McDade initially joined the team, Jefferson intended to have him collaborate with Strain as co-leads on the Physician Portal.[7]

Strain cooperated with McDade when he first joined the team in June 2003, in part because she initially assumed he would be doing support work for the Physician Portal, and in part because her understanding of UPMC's managerial hierarchy led her to believe that he was not on the "management track" and, thus, was not a threat to her chances for promotion.[8] Within the first three weeks, however, Strain became resentful and her demeanor toward McDade turned negative when he began to assume responsibilities that she had considered to be within her

---

[7]  Although Strain insisted that she had assumed that McDade would be taking over support for the Project Portal and claimed to have been unaware that the two would have overlapping functions, the weight of the testimony at trial established that, at least initially, Jefferson envisioned the two collaborating. This is evidenced by the fact that, when McDade began working on the Physician Portal, he proposed an organizational structure in which he would be the sole lead with Strain reporting directly to him. Significantly, Jefferson and Schwartz *rejected* this proposed reporting structure and instructed McDade to collaborate with Strain.

[8]  At trial, Strain testified that when she first heard McDade was joining the team, she was aware that his formal title was "Analyst IV." She also testified that she believed the Analyst IV position McDade held and the Project Lead position she held were "at the same level, but different titles," and that the distinction between them was based on what UPMC "forsee[s] as your future. Are you going to be a manager or leader, or are you more staying in an analyst position rather than going ahead to lead projects."

7

exclusive bailiwick.[9]  Additionally, Strain became unresponsive to some of the demands of the

project.[10]  Consequently, a few weeks after McDade joined the team, Jefferson recommended to

ISD director Sue Paone and Dr. Schwartz that Strain be removed from her lead role on the

project.  Instead, Jefferson concluded that the production-readiness activities involved in the

looming September 30, 2003 roll-out should be shifted to McDade.  Jefferson decided that Strain

would remain a member of the team and would continue to develop discrete portions of the

project, such as the smartcard and bio-terrorism components of the Physician Portal.[11]

     Strain did not welcome this change, and responded by becoming even less cooperative.

Throughout the summer of 2003, her demeanor at weekly Physician Portal team meetings led by

McDade became overtly negative.  Jefferson observed that Strain would arrive to meetings late,

sit away from the table, sigh, and not participate in discussion.[12]  In addition, Strain was not

furnishing McDade with information necessary for the roll-out; specifically, she was

uncooperative when he requested an update on the status of the smartcard component.

---

[9]     Donna Schwartz, a former UPMC employee unrelated to Dr. Schwartz, testified that Strain had
     confided in her that she resented McDade's involvement on the Physician Portal because she and
     McDade were both working on the same things.

[10]     Shortly after McDade joined the Physician Portal team, Jefferson met with Strain and McDade
     jointly.  When Jefferson asked for Strain's project plans, Strain responded that she did not do
     project plans.  Although Strain eventually did provide some of the documentation Jefferson had
     requested, she did so near the end of the period when the roll-out was to occur.

[11]     The smartcard is a credit card-sized piece of plastic with a computer embedded in it.  UPMC
     contemplated using the smartcard as an identification card, a keycard, and to store medical
     records information.  The bio-terrorism component of the Physician Portal was a result of the
     September 11, 2001 attacks, and work on this project continues with funding from the
     Pennsylvania National Guard.

[12]     Although Donna Schwartz testified contrariwise, she admitted that she did not observe how
     Strain interacted with McDade, either inside or outside the weekly team meetings, in part because
     she was teleconferenced (but not videoconferenced) into those meetings from home, where she
     worked while convalescing from an illness.

8

Consequently, with only five weeks left before the roll-out deadline, Strain's recalcitrance left McDade and Jefferson with insufficient information to ascertain whether the smartcard component would be ready in time.[13]

During the first weeks of September 2003, in anticipation that the current phase of the Physician Portal would be winding up after the roll-out, Jefferson began preparing a chart listing future assignments for the ISD employees who had been working on the project. The final version of the chart, dated September 22, 2003, reflected that McDade would continue to work on the next phase of the Physician Portal. In light of what had transpired between June 2003 and September 2003, Jefferson decided to reassign Strain to work on other projects at UPMC's Churchill facility, where Jefferson's office is located.[14] At the time Jefferson made this decision, she was unaware that Strain later would file a Charge of Discrimination against UPMC with the EEOC on October 10, 2003.[15]

On October 16, 2003, Jefferson met with Strain, showed her a copy of the organizational chart she had prepared, and explained her future assignment in UPMC's clinical and applications hosting group in Churchill, the facility where Jefferson's group was located. Strain began

---

[13]     At trial, Strain admitted that she had been "upset" by and "resistant" to what she perceived as McDade's efforts to usurp her responsibilities with respect to the smartcard component of the project, and she conceded that there was friction between the two.

[14]     Again, despite Strain's insistence that Dr. Schwartz made this decision, both Schwartz and Jefferson testified at trial that it was Jefferson alone who decided to remove Strain from the Physician Portal project, although Jefferson did consider his input before making this decision.

[15]     In her first EEOC Charge, Strain claimed that UPMC had unlawfully discriminated against her on the basis of her gender and age by replacing her with McDade on the Physician Portal and by demoting her from "acting" Project Manager to Project Lead.Strain's counsel conceded at trial that the reassignment was not retaliatory, but argued that her claims of retaliation involve the 2003 performance evaluation and the clerical functions she was given to perform following her reassignment. Counsel for both parties agreed at trial that there is no denial of promotion claim in this case.

9

working in her new assignment at the Churchill facility on December 1, 2003. On December 5, 2003, Dr. Schwartz gave Strain her 2003 performance evaluation, assigning her an overall rating of 2.03. The gist of Schwartz's evaluation was that Strain was a solid employee, but did not display the leadership or initiative that UPMC expected of its managers.[16] Two weeks later, Strain filed a second Charge of Discrimination with the EEOC and the Pennsylvania Human Relations Commission (PHRC).[17]

Jefferson continued to supervise Strain after the reassignment. In addition, David Fabrizi — who held the position of Senior Software Architect, a position with a pay classification above that of the Project Lead position that Strain held — became Strain's mentor, although Jefferson was the person who assigned work to Strain. Even before Strain began working at the Churchill facility, Jefferson contacted Fabrizi to discuss Strain's assignments. Jefferson apprised Fabrizi

---

[16]   In the 2003 evaluation, Dr. Schwartz observed that Strain needed to improve "in the independent identification of tasks to move the project forward," and that she "did not demonstrate the creativity or visioning capability that was necessary for this project." Schwartz also noted that "[a]dditional project personnel were added to manage the development efforts that [Strain] had difficulty coordinating and providing leadership for," and explained that she "did not demonstrate the ability to prioritize and needed a large amount of direction for determining priorities for competing demands." Because of his belief that Strain "required a large amount of supervision with direct input," Schwartz explained that the post-September 2003 phase of the Physician Portal "needed stronger leadership, networking skills and problem-solving capabilities than what [Strain] showed she could bring to the project." He did note, however, that Strain "demonstrated strength in a more structured environment with more concrete directions" and that she "would take direction well and consistently execute[d] directions."

[17]   In her second EEOC Charge, Strain alleged that UPMC unlawfully discriminated against her on the basis of gender and age by reassigning her from the Physician Portal to a position in which she no longer has any employees reporting directly to her and in which she performs clerical functions. In addition, she claimed that UPMC unlawfully retaliated against her twice in response to having filed her first EEOC Charge: first, when Dr. Schwartz rated Strain's performance for 2003 lower than he rated her performance in the past; and second, when she was given clerical functions to perform instead of Project Lead work. At trial, however, Strain testified that she did not believe that Jefferson had discriminated against her on the basis of age or gender.

10

of Strain's background, including her experience as a Project Lead and her clinical experience in medical processes. Accordingly, before Strain arrived at Churchill, Fabrizi recommended Strain for two projects: the Clinical Applications Infrastructure (CAI) Home Site project, and the CAI Collaboration Site project. Strain ultimately was assigned these projects, and her management responsibilities included coordinating meetings, communications, documentation and financial aspects of the projects; mentoring developers in their day-to-day duties; coordinating the internal and external resources needed to serve CAI's clients; and management of customer, project, and timeline expectations.

Strain did not, however, accept her new role with enthusiasm. In late 2003, for example, Jefferson assigned Strain the lead role in analyzing the support services UPMC offered patients when they used the HealthTrak Patient Portal (HealthTrak), which remained in the development phase.[18] After working for six months on HealthTrak, Strain completed her analysis and made some recommendations for streamlining the process. Strain did so with reluctance, however, making it clear that she did not want to perform the support functions, despite the fact that all the lead analysts, as well as Paone and Jefferson, performed the same support activities.

In 2004, Fabrizi transferred to another department and left the CAI group. William Freker, who was promoted to the position of Senior Software Architect following Fabrizi's transfer, stepped into Fabrizi's role and began to supervise Strain; after May 2004, Strain received all of her assignments from Freker. Freker testified that initially he assigned Strain to lead the CAI group's relationships with their clients who were in the hosting environment

---

[18]     HealthTrak would permit UPMC patients to take advantage of computer technology to interact with their physicians on-line. Jefferson considered it necessary for someone with a background in clinical care and web portals, such as Strain, to actually perform the support functions, including fielding calls concerning the registration of new patients.

11

because it was among the functions that he had performed as a Project Lead — the position he held before his promotion to Senior Software Architect. By 2005, Freker asked Strain to help manage the clients of his group, now known as the Enterprise Middleware Group (EMG). This involved responding to clients' service requests and managing service level agreements to ensure that the EMG was fulfilling its obligations under those agreements. Strain resisted the EMG assignment, telling Freker that she did not have knowledge of computer servers. As Freker explained, however, a technical knowledge of servers was not necessary to perform this assignment; instead, Strain only needed to know who was responsible for the servers and how to coordinate those personnel to meet clients' needs.[19]  By 2006, Freker staffed Strain as Project Lead for the EMG on MedTrak — which had evolved from the Physician Portal — and assigned her to a National Guard project involving a bio-terrorism portal. In addition, Strain was assigned the task of documenting meetings assigned to the Customer Relationship Management Physician Portal.

Freker testified that although Strain does what is specifically asked of her, she is only minimally motivated to work on her assigned projects and does not show the initiative he would expect from a Project Lead.[20]  When Freker evaluated Strain's performance during 2004, he assigned her what he considered to be a "middle of the road" rating of 2.5, primarily because he only recently had begun to supervise her and wanted to give her the benefit of the doubt. But as

---

[19]    Freker testified that although he had granted Strain's many other requests for training, she never asked him to provide her with server training, which was available at no cost to UPMC.

[20]    Like Paone and Jefferson, Freker had performed support functions on HealthTrak when he was a Project Lead. As he explained, this was necessary to the development of the project because there was no help desk at the time, and because the HealthTrak team was designing the process for how patients' calls would be handled.

Freker's familiarity with Strain's work grew, his assessment of her performance declined. In 2005, after having supervised Strain for a little more than one year, Freker rated her overall work performance as 2.09. Strain's rating dropped again slightly in 2006, when Freker pegged her overall performance at 2.06.

Despite Strain's performance issues at UPMC, she continues to hold her Project Lead position at its Churchill facility. Indeed, her pay rate at UPMC has never been decreased, and she continued to receive pay increases every year after 2000. Currently, Strain remains employed by UPMC full-time and is paid at an hourly rate of $35.07, which resulted in 2006 compensation of more than $72,000, not including health insurance and other benefits.

## III.    Standards of Review

As noted above, the Complaint states five causes of action. In Count One, Strain alleges that she was demoted from her position on the Physician Portal and replaced with McDade because of her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1) (ADEA). In Count Two, Strain claims that she was demoted because of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Title VII). In Counts Three and Four, Strain contends that after she complained about the alleged demotion and filed her EEOC Charge, UPMC retaliated by giving her an unfavorable performance evaluation in December 2003 and by giving her insufficient and inappropriate work to do at Churchill, in violation of the ADEA and Title VII. In Count Five, Strain maintains that her alleged demotion violated the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 955(a), *et seq.* (PHRA).

13

As Strain concedes in her post-trial briefing, she has no direct evidence of discrimination
or retaliation. (*See* Strain Findings at 32-33, 46). Where, as here, a plaintiff marshals only
indirect evidence of retaliation and age and gender discrimination, she must establish a *prima
facie* case under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,*
411 U.S. 792, 802-04 (1973), which will guide the Court's analysis of all of Strain's claims.[21]  A
*prima facie* case creates an inference of unlawful discrimination or retaliation; thus, unless an
employee establishes a *prima facie* case, no inference of discrimination or retaliation is raised
and the employer has no burden to proffer a reason for its action. *See Texas Dep't of Cmty.
Affairs v. Burdine,* 450 U.S. 248, 254 (1981); *see also Williams,* 380 F.3d at 759.

If, on the other hand, the plaintiff establishes a *prima facie* case, the burden of production
shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse
employment action. *See Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999). If the
defendant carries this burden of production, the plaintiff may prove, by a preponderance of the
evidence, that the defendant's articulated reason was not the actual reason, but rather a pretext
for unlawful discrimination or retaliation. *See Burdine*, 450 U.S. at 256; *see also Williams,* 380
F.3d at 759 n.3. Where, as here, a plaintiff attempts to prove pretext by indirect evidence, she
may meet this burden by offering evidence that the defendant's reasons are not worthy of
credence or that a discriminatory or retaliatory motive was more likely than not a "determinative
factor" in (or "but-for" cause of) her employer's decisions. *See Watson v. SEPTA,* 207 F.3d 207,

---

[21]     Although *McDonnell Douglas* created the decisional structure for Title VII cases, the Third
Circuit applies the same framework to the ADEA, the PHRA, and retaliation claims. *See
Connors v. Chrysler Fin. Corp.,* 160 F.3d 971, 972-74 (3d Cir. 1998) and *Williams v.
Philadelphia Housing Auth.,* 380 F.3d 751, 759 (3d Cir. 2004).

14

215, 222 (3d Cir. 2000); *see also Meyer v. Nicholson*, 441 F. Supp.2d 735, 746 (W.D. Pa. 2006) (applying the "determinative factor" test to a retaliation claim).

Finally, the Court is mindful that the foregoing standards are to be applied consistent with Rule 52(a) of the Federal Rules of Civil Procedure, which governs bench trials. In considering whether Strain has met her burden, the Court, as fact-finder, must weigh evidence and draw all reasonable inferences therefrom. *See* Fed. R. Civ. P. 52(a); *see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 856 (1982). In particular, "we note that in a bench trial, sitting as the trier of fact, the Court is called upon to assess the credibility of the witnesses." *Moss v. KoolVent Aluminum Products, Inc.*, 962 F. Supp. 657, 669 (W.D. Pa. 1997) (internal quotation marks omitted) (citing *Nixon v. Runyon,* 856 F. Supp. 977, 985 (E.D. Pa. 1994) (citing in turn *Anderson v. City of Bessemer City,* 470 U.S. 564, 564 (1985)).

## IV. Conclusions Of Law

The Court proceeds to assess the evidence introduced at trial with the aforementioned *McDonnell Douglas* framework in mind. As will be explained in detail below, the Court finds that Strain neither has demonstrated that any adverse employment action was taken against her nor raised an inference that UPMC unlawfully discriminated or retaliated against her. The Court further finds that, even if the evidence could support a *prima facie* case, Strain has not shown that the legitimate, nondiscriminatory reasons UPMC offered for its actions are pretextual.

### A. Strain Has Not Made Out A *Prima Facie* Case Of Discrimination Or Retaliation

To establish a *prima facie* case of age or gender discrimination, Strain must establish that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment

15

action; and (3) the action was taken under circumstances which raise an inference of discriminatory animus.[22] *See Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003); *see also Jones v. School Dist. of Philadelphia,* 198 F.3d 403, 410-11 (3d Cir. 1999); *Connors,* 160 F.3d at 973-74. Consistent with the principle that "the *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied," *Sarullo*, 352 F.3d at 798 (citation omitted), the Court applies the same three elements to Strain's retaliation claim, except that instead of membership in a protected class, she must show that she engaged in protected activity to make out a *prima facie* case of retaliation. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir. 1997).

The record shows that Strain occupies protected gender and age classifications and that she engaged in protected behavior by filing an EEOC Charge. There is not, however, evidence of either of the other two elements of her discrimination and retaliation claims: *i.e.*, the Court finds that Strain has not shown by a preponderance of the evidence that UPMC took an adverse employment action against her, or that the actions it did take raised an inference of discriminatory or retaliatory intent. These two points, along with the evidence pertinent to each, will be analyzed *seriatim* below.

## 1.     UPMC Did Not Take Any Adverse Employment Action Against Strain

Strain urges the Court to find that UPMC took three adverse employment actions against her. First, she claims that UPMC "stripped [her] of her duties and responsibilities as a Project

---

[22]     As counsel for Strain conceded at trial, her discrimination claims are not predicated on UPMC's alleged failure to promote her. Accordingly, although there is no dispute that Strain was qualified for the Project Lead position she has held since 1999, the record contains no evidence — and the Court need not consider — whether she was qualified for a Project Manager position.

16

Manager in June, 2003." (Strain Findings at 47). Second, Strain maintains that she "suffered a second adverse employment action when she was effectively given no work to do after her transfer to the Churchill facility in January, 2004." (Strain Findings at 47). Third, Strain insists that Dr. Schwartz's December 2003 performance evaluation was an adverse employment action. (*See* Strain Findings at 46). The Court's review of the record confirms that, in the circumstances of this case, Strain has failed to prove that she suffered an adverse employment action.

The Supreme Court has defined an adverse employment action as "[a] tangible employment action constitut[ing] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits . . . A tangible employment action in most cases inflicts direct economic harm." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761-62 (1998). Following *Ellerth*, the Third Circuit has defined an adverse employment action as an "action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions or privileges of employment." *See Storey v. Burns Int'l Sec. Servs.,* 390 F.3d 760, 764 (3d Cir. 2004) (citation and internal quotation marks omitted). In the context of retaliation claims, the Court considers whether an employment action is "likely to dissuade employees from complaining or assisting in complaints about discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White,* __ U.S. __, 126 S. Ct. 2405, 2416 (2006).

Despite Strain's claim that she was "demoted" from her role as "Project Manager" of the Physician Portal, the record confirms that although she certainly "managed" projects, and was a "project manager" in the colloquial sense, she *never officially held* that position at UPMC. Rather, Strain's insistence that she *was* a "Project Manager" or "acting Project Manager" reflects

17

merely that she arrogated this title unto herself. In light of the testimony at trial, the Court finds

that Dr. Schwartz used the terms "Project Lead" and "Project Manager" interchangeably without

regard for the fact that the two terms had very specific and distinct meanings in UPMC's human

resources hierarchy. But Strain knew better all along: although her aspirations of promotion

may have prompted her to claim the title of "Project Manager," the evidence establishes that

Strain served as, had the duties of, and *was paid as*, a "Project Lead" before, during, and after

McDade's addition to the team.[23] In these circumstances, the Court cannot find that this

"demotion" was an adverse employment action.[24] Regardless of Strain's official title, her

complaint that she was "stripped of her duties" in June 2003 is unsupported by the record. If

anything, the addition of McDade to the team gave Strain *additional*, very important duties,

namely, to cooperate with him and coordinate her work with his to roll out the Physician Portal

on schedule.

Nor can the Court conclude that the nature of Strain's work assignments after her transfer

to UPMC's Churchill facility amounted to a materially adverse employment action sufficient to

sustain her retaliation claim. As a threshold matter, the Court recognizes that "something less

than a discharge could be an adverse employment action." *Jones*, 198 F.3d at 411. But at least as

---

[23]    In fact, Strain continued to receive yearly raises. As the Third Circuit has explained, the absence
of a direct economic impact, if not the *sine qua non* of an adverse employment action, is
nevertheless an "important factor" in deciding whether an employer's action is adverse. *See
Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152-53 (3d Cir. 1999).

[24]    As Strain's counsel conceded at trial, she does not bring a failure-to-promote claim. Thus, she
has not demonstrated that she was qualified for an official promotion to Project Manager. *See
Bailey-Pittman v. Unisia of Georgia Corp.*, No. 04-CV-84, 2006 WL 871100, at *7 (M.D. Ga.
March 31, 2006) (concluding that a plaintiff who claimed that "she did, in fact, act as a
supervisor" but "never held the title of 'Supervisor'" could not state a *prima facie* case of
discrimination on a failure-to-promote theory where she did not demonstrate that she was
qualified for the position she sought).

18

long as a reasonable employee would not be deterred from taking the protected activity, *see Burlington*, 126 S. Ct. at 2416, "a change in [. . .] office, reporting relationship and responsibilities is insufficient to establish an adverse employment action." *Fuller v. Global Custom Decorating*, No. 04-CV-285, 2007 WL 44507, at 20 (W.D. Pa. Jan. 5, 2007) (internal quotation marks omitted) (quoting *Langley v. Merck & Co.*, 186 Fed. Appx. 258, 260 (3d Cir. 2006) (affirming the district court's grant of summary judgment where the plaintiff no longer supervised employees and her responsibilities changed but there was no loss of benefits and she reported to the same position that she previously held)).

The record reflects that what Strain characterizes as a "demotion" was no more than a lateral transfer with some changes in responsibilities. Although the Court believes Strain's testimony that she was not busy immediately after her transfer, the Court specifically finds no credible factual basis for Strain's claim that she was "effectively given no work to do" after her transfer to Churchill. (*See* Strain Findings at 47). Instead, the record suggests that it took some time for UPMC to decide exactly how best to use Strain's talents after her transfer, and that this consideration, more than anything else, accounted for Strain's perception that she was being underutilized. The Court finds credible Freker's and Jefferson's testimony that after Strain became assimilated in the Churchill group following her reassignment, she continued to be assigned the quantity and quality of work that Project Leads at UPMC typically perform.[25] There is no evidence that the transfer or the events surrounding it made Strain's commute any

---

[25]  The only substantive change that the Court can ascertain from Strain's reassignment is that she was no longer directly supervising UPMC employees. But this factor is not dispositive. *See Fuller*, WL 44507, at *2 (finding no adverse employment action when plaintiff stripped of her supervisory duties); *see also Langley*, 186 Fed. Appx. at 260-62 (same). Indeed, the Court believes Freker's testimony that not all of UPMC's Project Leads have supervisory duties.

more onerous, or materially altered any of the other conditions of her employment. Accordingly, the Court does not find that Strain's post-transfer assignments would have deterred a reasonable employee in her situation from filing the EEOC Charges. *See Burlington*, 126 S. Ct. at 2416.

Finally, the Court finds that Strain's contention that Dr. Schwartz's December 2003 evaluation of her performance that year was an adverse employment action is meritless. Negative employment evaluations may, if sufficiently caustic and harmful, be "adverse" within the meaning of *Ellerth, see, e.g., Bostic v. AT & T of Virgin Islands,* 166 F. Supp.2d 350, 363 (D. V.I. 2001), if they would deter a reasonable employee from taking the protected action. *See Burlington*, 126 S. Ct. at 2416. However, "the performance evaluation must be "unwarranted"; otherwise, it is not materially adverse. *See Long v. Thomson Industries, Inc.,* No. 99-CV-1693, 2000 WL 1586078, at *6 (E.D. Pa. Oct. 24, 2000) (citation omitted). Additionally, "[e]ven a poor performance rating does not give rise to an adverse employment action unless it has a tangible effect on recipient's employment." *Shesko v. City of Coatesville,* 292 F. Supp.2d 719, 727-28 (E.D. Pa. 2003) (citation omitted).

Here, Strain has not convinced the Court that Dr. Schwartz's assessment of her performance in 2003 was unwarranted. Schwartz's testimony, which the Court finds credible, establishes that Strain failed to meet milestones, required more direct supervision than Schwartz had time to provide, reacted poorly to criticism, and generally had proven herself incapable of functioning productively in the unstructured environment of the Physician Portal project. The credible testimony of Jefferson and McDade show that after McDade's addition to the team in June 2003, Strain's territorial behavior manifested itself in counterproductive — if not obstructive — interactions with the other members of the team. Nor has Strain shown that this

20

evaluation had a "tangible effect" on her employment. Despite Strain's contention that the December 2003 evaluation arrested her rise up the managerial ranks at UPMC, there is no evidence that her December 2003 evaluation, as opposed to any of Schwartz's other evaluations of her performance — none of which she challenges and *all* of which placed her at the "bottom" of the group Schwartz evaluated — excluded her from, or otherwise diminished her chances of obtaining, the promotions and transfers she sought. *See Morrison v. Carpenter Tech. Corp.*, No. 03-CV-6102, 2005 WL 435233, at *14 (E.D. Pa. Feb. 22, 2005) (finding that a performance review did not amount to an adverse action capable of supporting a retaliation claim); *Rotteveel v. Lockheed Martin, Corp.*, No. Civ.A. 01-6969, 2003 WL 21956426, at *9 (E.D. Pa. July 11, 2003) (same). Again, the Court does not find that the content of Schwartz's December 2003 review would have deterred a reasonable employee in Strain's situation from filing the EEOC Charges. *See Burlington*, 126 S. Ct. at 2416.

The Court has no doubt that Strain's transfer off the Physician Portal project in October 2003 and into a facility where she sometimes worked under former subordinates on assignments that she subjectively viewed as less meaningful — followed by Dr. Schwartz's criticisms of her initiative and leadership abilities in his December 2003 employment evaluation — were disappointing and embarrassing to her. But even in the face of more material and deleterious effects on the employee's status, this Court has held that such harm does not rise to the level of an adverse employment action.[26] Beyond Strain's and her husband's testimony about her post-

---

[26]     *See Riding v. Kaufmann's Dept. Store,* 220 F. Supp.2d 442, 465 (W.D. Pa. 2002) (noting that "a lateral transfer, where the employee's existing title would be changed and the employee would report to a former subordinate, may have caused a 'bruised ego,' but did not constitute an adverse employment action") (citation omitted); *see also Love v. United Parcel Service*, No. 04-CV-964, 2006 WL 2806565, at *3 (W.D. Pa. Sept. 28, 2006) (explaining that a plaintiff's "subjective (continued...)

21

transfer unhappiness, there is no evidence that her removal from the Physician Portal left her any worse off than she was before, that Schwartz's evaluation was retaliatory or torpedoed her hopes of advancement within the company, or that her assignments at Churchill were demeaning make-work. Indeed, all of the other evidence supports the view that Strain continues to be assigned meaningful work appropriate for a Project Lead which should, if performed diligently, occupy her full-time. Accordingly, the Court finds that Strain has not met her burden of proving that UPMC took any action serious and tangible enough to alter the terms, conditions, privileges or compensation of her employment. *See Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir. 2001). Furthermore, the Court finds no materially adverse employment action to support Strain's retaliation claim because none of the actions UPMC took after she filed her EEOC charges would have deterred a reasonable employee in Strain's circumstances from taking this protected activity. *See Burlington*, 126 S. Ct. at 2416. Having failed to show an adverse employment action, Strain has not made out a *prima facie* case on any of her claims.

## 2.   There Is Insufficient Evidence to Support An Inference of Discriminatory or Retaliatory Intent

Even if the evidence could support a finding of an adverse employment action against Strain — and as explained above, it cannot — the Court would conclude that she has not made out a *prima facie* case of discrimination or retaliation. Strain argues that UPMC's act of replacing her with a younger male permits the inference that her age and her gender were "determinative factor[s]" in the decision to remove her from the Physician Portal. (Strain Findings at 31-34). Strain also maintains that the diminished quality and quantity of the work

---

[26](...continued)
    belief that a transfer is less desirable or demeaning cannot suffice" to show an adverse
    employment action).

22

assigned to her after the transfer to Churchill — assignments that she alleges are neither meaningful nor sufficient to keep her busy more than a few minutes per day — permit the inference that UPMC retaliated against her for filing the EEOC Charge. (*See* Strain Findings at 45). After having reviewed the record, however, the Court finds that Strain has not demonstrated that the actions UPMC took support an inference of discriminatory or retaliatory intent.

At the outset, the Court notes that two considerations work in Strain's favor as to this element of her claims. First, UPMC's decision to replace Strain on the Physician Portal team with a male employee who was more than 20 years her junior could create an inference of age- and gender-discriminatory animus. *See Hill v. Borough of Kutztown,* 455 F.3d 225, 247 (3d Cir. 2006); *see also Toomey v. Apple Press, Ltd.*, 152 F. Supp.2d 634, 639 (E.D. Pa. 2001). Second, the fact that Jefferson might have considered Strain's substantive assignments at Churchill in light of the EEOC Charges could support the inference that retaliatory motive animated those decisions. *See Fasold v. Justice,* 409 F.3d 178, 190 (3d Cir. 2005) ("[W]hen only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn."). However, it is not *necessarily* true that Strain's replacement by a younger male and Jefferson's knowledge of her then-pending EEOC Charges, by themselves, satisfy this element of Strain's *prima facie* case on her discrimination and retaliation claims. *See Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3d Cir. 1991) (requiring more than temporal proximity alone to permit the inference of a retaliatory motive); *see also Obitko v. Ohio Barge Line, Inc.,* 628 F. Supp. 62, 65 (W.D. Pa. 1986) (noting that "replacement by someone younger, without more, will not give rise to an inference of age discrimination") (citation omitted);

23

*Atkinson v. Lafayette College,* No. 01-CV-2141, 2003 WL 21956416, at *8 (E.D. Pa. July 24, 2003) ("even though Plaintiff was replaced by a man [. . .], this, standing alone, is not sufficient to satisfy a *prima facie* case of gender discrimination."). Even if timing alone were enough to create an inference, the two-month gap between Strain's filing of her first EEOC Charge and her December 2003 employment evaluation may be too long. *See Williams*, 380 F.3d at 760 (holding that a two month lapse between the protected activity and the alleged retaliation does not create an inference of retaliatory intent).

Rather, to assess whether an inference of discrimination or retaliation fairly may be drawn, the Court must examine "the proffered evidence, looked at as a whole." *See Kachmer v. SunGuard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir. 1997) (citation omitted); *see also Ferguson v. University of Pennsylvania,* No. 95-CV-938, 1996 WL 432491, at *10 (E.D. Pa. July 29, 1996), (explaining that "[t]he issue of whether discriminatory intent by Defendant must be inferred from [plaintiff's supervisor's] actions and testimony must be viewed in the context of the entire record."), *aff'd*, 142 F.3d 427 (3d Cir. 1998) (table). Where, as here, a plaintiff claims that the circumstances surrounding her transfer and reassignment within her company support the inference of improper animus, her "mere assertions that [her] new position was degrading, unsupported by any evidence, is not sufficient" to trigger the inference of animus. *See Wardle v. County of Montgomery,* No. 05-CV-2808, 2006 WL 2171976, at *7 (E.D. Pa. July 28, 2006). Although the circumstances of Strain's reassignment to Churchill could, in the abstract, support an inference of discriminatory and retaliatory animus, the Court finds that she has not met her burden under the circumstances presented at trial.

24

In Strain's case, any inference that UPMC had illegal motives in undertaking the first alleged adverse employment action — *i.e.*, her removal from the Physician Portal project — is undercut by the identity of the decisionmaker involved. Specifically, the evidence shows that Mary Jo Jefferson was the one who decided to remove Strain from the Physician Portal and relocate her to UPMC's Churchill facility. The evidence further demonstrates — and Strain concedes — that at least initially, Jefferson selected Strain's post-transfer assignments. (*See* Strain Findings at 37). The fact that Jefferson and Strain are both in the same protected age and gender group — *i.e.*, both are women over the age of 40 — weakens any inference of discriminatory animus. *See Sherrod v. Booker T. Washington Center*, No. 04-CV-208, 2006 WL 2707317, at *7 (W.D. Pa. Sept., 19, 2006) (quoting *Rajbahadoorsingh v. Chase Manhattan Bank, NA,* 168 F. Supp.2d 496 (D. V.I. 2001) for the proposition that, where the plaintiff and the decisionmaker were of same race, "it is hard to fathom how [decisionmaker's] statements could be construed to show that [plaintiff's] termination was racially motivated.").[27] Moreover, Strain testified that she did not believe Jefferson ever discriminated against her on the basis of her age or gender.[28]

---

[27]    Strain does not allege that Jefferson's decision to remove her from the Physician Portal was retaliatory, and the evidence would not support such a contention. Instead, the evidence shows that Jefferson decided to take Strain off the project in September 2003, several weeks *before* Strain ever filed her first EEOC Charge. *See Sarullo*, 352 F.3d at 801; *see also Hegyes v. U.S. Steel Corp.*, No. 04-CV-1283, 2007 WL 218711, at *19 (W.D. Pa. Jan. 25, 2007).

[28]    *See Henderson v. Nordstrom, Inc.*, No. C05-0022RSM, 2006 WL 1148178, at *6 (W.D. Wash. Apr. 27, 2006) (noting that a plaintiff's concession that she did not believe that the decisionmaker who removed her from her position treated her any differently because of her age "negates any possibility of an inference of age discrimination").

25

Regarding the type and quality of the assignments given to Strain since her transfer to the Churchill facility, the Court finds that the evidence does not permit the inference of retaliatory animus. As noted above, the testimony of Jefferson and Freker, which the Court finds credible, establish that, after an initial period in which the Churchill facility adjusted to the addition of Strain, her post-transfer assignments ultimately were comparable in quantity and quality to those given to any other full-time Project Lead. *See Washington v. Martinez*, No. 03-CV-3529, 2004 WL 632705, at *8 (E.D. Pa. Jan. 28, 2004) (holding that a plaintiff alleging discriminatory work assignments had not established an inference of discriminatory animus where she had "not presented evidence that she was purposefully deprived of sufficient work assignments or that she had specialized training or experience which was disregarded in assigning work"). Moreover, even if Strain had shown that the quantity or quality of her post-transfer assignments suffered — and as stated above, she has not — she still has not demonstrated how the assignments she received at Churchill were in any way connected to her age, gender, or her EEOC Charges. Without this connection, Strain's claims must fail. *See Woodard v. PHB Die Casting,* No. 04-CV-141, 2005 WL 3093180, at *8 (W.D. Pa. Nov. 18, 2005) (holding that an employer who excluded the plaintiff from the choice job assignments "may indeed have 'had it out for'" the plaintiff, but that such preferential treatment "does nothing to ascribe any racial animus to the discriminatory conduct.").[29]

---

[29]     Although Strain contends that Dr. Schwartz's December 2003 evaluation was an adverse employment action, it is unclear whether she is asking the Court to draw an inference of retaliatory animus from the timing of that evaluation. (*See* Strain Findings, at 45-46). In any event, the Court could draw no such inference. To establish a *prima facie* case of retaliation stemming from a negative review, Strain must raise an inference of retaliatory animus *associated with that review. See Hay v. GMAC Mortgage Corp.*, No. 01-CV-1030, 2003 WL 22133801, at *6 (E.D. Pa. Sept. 15, 2003), citing *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. (continued...)

26

In the final analysis, Strain "has failed to provide evidence sufficient to establish that the change in [her] job location and the consequential changes to [her] daily duties is in any way punitive," *see Wardle,* 2006 WL 2171976 at \*6, and thus, the Court finds that the record contains insufficient evidence to support an inference of discriminatory or retaliatory animus. Strain rests on her own speculation that her age, gender, or EEOC charges prompted her removal from the Physician Portal and influenced the assignments she received after her transfer to Churchill. But "[s]peculations, generalities, and gut feelings, however genuine, do not allow for an inference of discrimination to be drawn when they are not supported by specific facts," *Eason v. Del Monte Foods,* No. 04-CV-1698, 2006 WL 2645146, at \*9 (W.D. Pa. Sept. 14, 2006) (citation omitted), particularly where, as here, the record contains credible evidence to contradict each of Strain's assumptions. Reading the record as a whole, the Court does not find substantial evidence to support the critical inference that Strain invites the Court to draw: namely, that her age and gender were motivating factors in her removal from the Physician Portal, or that either of her EEOC Charges in any way affected the quantity or quality of the post-transfer assignments she received. Thus, even if Strain had demonstrated an adverse employment action — and she has not — she still would have failed to state a *prima facie* claim of discrimination or retaliation.

---

[29](...continued)

> 2000) ("A poor performance evaluation alone does not give rise to a case of discrimination, but must be accompanied by a clear inference or connection to discriminatory animus."). In light of the relative consistency of Dr. Schwartz's annual evaluations of Strain — including his uncontroverted testimony that all of his evaluations of Strain's performance put her at the "bottom" of the group he supervised — the Court cannot find retaliatory animus, let alone connect it with the 2003 review.

27

## B. Even If Strain Had Stated A *Prima Facie* Case, She Has Not Shown That The Legitimate, Nondiscriminatory Reason UPMC Offered Is Pretextual

As explained above, the Court finds that a number of deficiencies in the evidence preclude Strain from establishing a *prima facie* case of discrimination or retaliation. That being so, the Court need not reach the issue of pretext. *See Burdine,* 450 U.S. at 254; *see also Williams,* 380 F.3d at 759; *Geraci v. Moody-Tottrup, Intern., Inc.,* 82 F.3d 578, 582 (3d Cir. 1996). But even if Strain had stated a *prima facie* case, she would not be entitled to recover on any of her claims because she has not demonstrated that UPMC's legitimate, nondiscriminatory reasons for its actions mask pretext. *See McDonnell Douglas,* 411 U.S. at 802-03; *see also Burdine,* 450 U.S. at 253.

At the outset, the Court notes that UPMC offered specific reasons for each of the allegedly adverse employment actions: Strain's inability to function on the team after McDade's arrival and the perception that Strain could receive closer supervision and put her skills to better use in Jefferson's group. Strain concedes that UPMC's reasons are legitimate and nondiscriminatory, (*see* Strain Finding at 33), and the Court so finds.[30] That being so, Strain must prove, by a preponderance of the evidence, that UPMC's articulated reasons were not the real reasons, but were a pretext for discrimination or retaliation. *See Burdine,* 450 U.S. at 253. Strain was required to meet this burden by proving that UPMC's reasons for its actions are "unworthy of credence." *Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 136 (3d Cir. 1997) (citations omitted). Her evidence must "demonstrate such weaknesses, implausibilities,

---

[30]   *See Nicholson v. Bradley Graphic Solutions, Inc*, No. 03-CV-2151, 2004 WL 870692, at *5 (E.D. Pa. Apr. 22, 2004) (finding that a plaintiff's "interpersonal conflicts in the workplace" was a legitimate, nondiscriminatory reason for firing him); *see also Johnson v. Resources for Human Dev.*, 878 F. Supp. 35, 38 (E.D. Pa. 1995) (allegation that the plaintiff "generally worked poorly with his supervisors" was a legitimate, nondiscriminatory reason for the employer's actions).

28

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Tomasso v. Boeing Co.,* 445 F.3d 702, 706 (3d Cir. 2006) (citation, alterations, and internal quotation marks omitted). In other words, Strain's burden at trial was to convince the Court "*both* that the employer's proffered reason was false, *and* that discrimination was the real reason for the decision about which the plaintiff complains." *Torre v. Casio, Inc.,* 42 F.3d 825, 829-30 (3d Cir. 1994) (citation, internal quotation marks, and alterations omitted) (emphasis in original). The Court holds that Strain has not met her burden of proving pretext.

In the case at bar, the evidence germane to at least one element of Strain's *prima facie* case, *viz.,* her burden of showing that the evidence creates an inference of discriminatory or retaliatory animus, overlaps the evidence on the issue of pretext, a fairly typical situation in cases decided under the *McDonnell Douglas* burden-shifting rubric. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 286 (3d Cir. 2000) ("As our cases have recognized . . . evidence supporting the *prima facie* case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other"); *see also Jones v. University of Pennsylvania,* No. 00-CV-2695, 2003 WL 21652083, at *4 n.2 (E.D. Pa. March 20, 2003). Thus, to the extent that Strain's evidence does not permit an inference of discriminatory or retaliatory animus, that same deficiency comes back to haunt her on the issue of pretext.

The Court finds credible Jefferson's testimony that Strain's removal from the Physician Portal project was prompted by her inability to work productively with McDade, and that the transfer would have occurred regardless of Strain's age or gender. The record is more consistent with the view that, after several quick promotions at UPMC in the late 1990s, Strain's career trajectory had plateaued by the time she became involved with Dr. Schwartz and the Physician Portal. Viewing this project as a way to resume her rise in the ranks of management at UPMC, Strain accepted it with enthusiasm. But in part because Schwartz spent too much of his time supervising Strain, and in part because the team needed leadership with technical skills before the Physician Portal could advance past the pilot stage, McDade was added to the team as Strain's peer. Viewing McDade as a threat rather than a helpful hand, Strain's attitude became negative and uncooperative soon after McDade's arrival. Insofar as Strain's conduct forced the team to work around her rather than with her, her fears became a self-fulfilling prophesy: within five months of McDade's arrival, he was leading the team and she was on the outside looking in. In light of this state of affairs, the Court finds that Strain was removed from the Physician Portal because Jefferson believed she was a disruptive force on a project that required teamwork, and because Strain's deficiencies as a manager meant that she needed to be in a location where she could be supervised. Whether this was "the best, or even a sound, business decision" is beside the point. *See Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108-09 (3d Cir. 1997) (citation omitted).

Furthermore, the Court believes Jefferson's and Freker's testimony that the assignments Strain has been given since her transfer to Churchill are of comparable quality and quantity as those given to other Project Leads, and that her filing of EEOC Charges has not impacted the

30

particular assignments she has received. Indeed, Freker testified convincingly that the projects and duties to which Strain currently is assigned are of the same nature that he performed, before he was promoted up from Project Lead. Freker further testified, and the Court believes, that the diligent performance of the duties to which Strain has been assigned at Churchill should be a full-time endeavor, and that outstanding effort on those assignments would make her eligible for further promotions, notwithstanding the fact that she no longer supervises UPMC analysts directly. Although Strain insists that the tasks she is assigned are meaningless and brief, the Court concludes that Freker's and Jefferson's testimony to the contrary is persuasive, and certainly not so weak, implausible, inconsistent, incoherent, or contradictory as to be unworthy of credence. *See Tomasso,* 445 F.3d at 706; *see also Keller v. Orix Credit Alliance,* 130 F.3d 1101, 1110 (3d Cir. 1997) *(en banc)* (defining pretext as being an explanation of the discharge that "is so plainly wrong that it cannot have been the employer's real reason for the challenged decision").

Finally, Dr. Schwartz's testimony that his December 2003 evaluation was based on a fair assessment of Strain's performance during the prior year is quite credible in light of all the facts of record. Although it is true that Strain's overall evaluation in 2003 was quantitatively worse than were either of her two previous evaluations, that is to be expected: after all, it was not until 2003 that Strain became openly resentful and resistant to an important member of the Physician Portal team at a critical time for the project. Additionally, the Court notes that Schwartz had similar criticisms about Strain's abilities, in one form or another, in his 2001 and 2002 evaluations, and that — according to his uncontroverted testimony at trial — all three of his evaluations of Strain placed her performance at the "bottom" of the group he evaluated.

31

Although Strain makes much of the fact that she was never counseled, warned, or disciplined for any of her shortcomings, all of this only goes to whether UPMC *ought* to have done so in the interest of sound management: not whether its failure to do so amounts to evidence of pretext. *See Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1216 (3d Cir. 1988) (refusing to second-guess an employer's determination that the plaintiff had done a poor job in completing a specific task even where the plaintiff was never warned that he was failing to meet company expectations regarding the task, stating that "our inquiry must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee").

In sum, the evidence adduced at trial does not support the inference that UPMC discriminated or retaliated against Strain. For similar reasons, Strain cannot meet her ultimate burden of persuading the Court that UPMC's legitimate, nondiscriminatory explanations for its actions are actually false, and that its true motive was discriminatory or retaliatory. *See Williams-McCoy v. Starz Encore Group,* No. 02-CV-5125, 2004 WL 356198, at *14 (E.D. Pa. Feb. 5, 2004) (holding that a plaintiff's "evidence [. . .] is unavailing to show pretext for the same reasons that such evidence does not give rise to an inference of discrimination."). Because Strain did not prove that age, gender, or protected activity was the but-for cause of her removal from the Physician Portal project in October 2003, the content of her December 2003 evaluation, or the quality and quantity of her work assignments at Churchill thereafter, she has not met her ultimate burden of persuading the Court that the reasons UPMC has offered for its actions were pretextual. *See Watson,* 207 F.3d at 222; *see also Meyer,* 441 F. Supp.2d at 746.

32

## V.    Conclusion

For all of the foregoing reasons, the preponderance of the evidence compels the

conclusion that Defendant UPMC did not discriminate against Plaintiff Virginia Strain on

account of her age or gender, and did not retaliate against her for filing EEOC Charges.

Accordingly, the Court finds for Defendant on all of Plaintiff's claims.

An appropriate order follows.

Thomas M. Hardiman
United States District Judge

Dated: March 27, 2007

33